**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 6 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRUCE L. EVANS,

Defendant - Appellant.

No. 01-3345

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO.   00-CR-40082-01-RDR)**

Submitted on the briefs:

David J. Phillips, Federal Public Defender, District of Kansas; Melody Evans, Assistant Federal Public Defender, Topeka, Kansas; for the Defendant-Appellant.

Eric F. Melgren United States Attorney, District of Kansas; James A. Brown, Special Assistant United States Attorney, Topeka, Kansas; for the Plaintiff-Appellee.

Before **HENRY** , Circuit Judge,   **BRORBY** , Senior Circuit Judge, and   **HARTZ** , Circuit Judge.

**HENRY** , Circuit Judge.

The defendant Bruce Evans was convicted after a jury trial of five counts relating to the manufacture of methamphetamine.[1] The district court sentenced him to a total term of imprisonment of 135 months.

In this appeal, Mr. Evans challenges his conviction for creating a substantial risk of harm to human life while attempting to manufacture methamphetamine (a violation of 21 U.S.C. § 858) on two grounds. First he argues that the statute is unconstitutionally vague. Second, he asserts that the evidence is insufficient to support that conviction.

Mr. Evans also challenges the district court's determination of his sentence. He focuses on the provisions of the United States Sentencing Guidelines (USSG) that relate to grouping counts of conviction for sentencing purposes. According to Mr. Evans, the district court should have applied USSG § 2D1.10 rather than

---

[1] In particular, the jury convicted Mr. Evans of: (1) manufacture of methamphetamine (a violation of 21 U.S.C. § 841(a)(1)); (2) creating a substantial risk to human life while attempting to manufacture methamphetamine (a violation of 21 U.S.C. § 858); (3) two counts of possession listed chemicals (ephedrine and pseudoephedrine) with intent to manufacture methamphetamine; and (4) attempted manufacture of methamphetamine (a violation of 21 U.S.C. § 846). The first two charges and one of possession of listed chemical counts arose out of conduct on August 13, 2000. The other possession of listed chemical count and the § 846 charge for attempted manufacture of methamphetamine arose out of conduct on October 16, 2000.

    We note that at the time of Mr. Evans's conviction, the offense of possessing listed chemicals with the intent to manufacture methamphetamine was set forth in 21 U.S.C. § 841(d)(1). See Rec. vol. I doc. 137 (Judgment filed Oct. 15, 2001) (describing the possession of listed chemical counts as violations of § 841(d)(1)). Currently, that offense is set forth in 21 U.S.C. § 841(c)(1).

USSG § 2D1.1.

Finally, Mr. Evans challenges the two counts of conviction arising out of conduct on October 16, 2000. He contends that the evidence is insufficient to establish proper venue in the District of Kansas.

We are not persuaded by Mr. Evans's challenges to his § 858 conviction. As applied to the facts of this case, we conclude that the statute is not unconstitutionally vague. Additionally, we hold that, viewed in the light most favorable to the government, the evidence is sufficient to support Mr. Evans's conviction under that statute. Similarly, we are not persuaded by Mr. Evans's challenge to the determination of his sentence under the grouping provisions of the Guidelines.

However, we agree with Mr. Evans that, as to the two convictions arising out of conduct on October 16, 2000, the government failed to establish by a preponderance of the evidence that venue was proper in the District of Kansas. Accordingly, we remand the case to the district court with instructions to vacate those convictions and for further proceedings consistent with this opinion.

I. BACKGROUND

In August 2000, deputies with the Cherokee County, Kansas Sheriff's

Department received information indicating that storage tanks on property outside Mr. Evans's residence contained anhydrous ammonia, a substance that, according to government witnesses, is commonly used in manufacturing methamphetamine. As a result, on August 12, 2000, Cherokee County Deputy Sheriff Terry Clugston went to the residence and interviewed Mr. Evans. Mr. Evans permitted Deputy Clugston to walk around the yard, and he showed him containers of acetone, toluene, and starter fluid—chemicals that the government's witnesses explained are also used to produce methamphetamine.

Mr. Evans allowed Deputy Clugston inside the residence, where he lived with his wife Karen Evans and their three minor children, ages thirteen, twelve, and nine. There, Deputy Clugston observed a variety of glassware, chemicals, and separating liquids on the kitchen floor. Concluding that he had discovered evidence of a laboratory used to manufacture methamphetamine, Deputy Clugston contacted the Kansas Bureau of Investigation. Law enforcement officials there obtained a search warrant for Mr. Evans's residence and property and, along with Cherokee County deputy sheriffs, executed the warrant on the following day. Tim Holsinger, a special agent with the Kansas Bureau of Investigation, directed the search.

During the search of Mr. Evans's property, Agent Holsinger discovered thirteen storage tanks. At trial, the government introduced expert testimony

-4-

indicating that the tanks had once contained anhydrous ammonia. Agent Holsinger also discovered a pile of empty acetone and alcohol containers that had been burned.

When he initially entered the residence, Agent Holsinger noticed the odor of anhydrous ammonia. On the kitchen floor, he observed jars, plastic containers, and glassware holding a variety of liquids, tablets, and powders. He also discovered funnels, filters, lithium batteries, digital scales, and empty pill bottles. Additionally, Agent Holsinger found twenty-two firearms.

Chemists employed by the United States Drug Enforcement Agency (DEA) tested many of the substances, and they explained their conclusions at trial. In particular, a DEA chemist testified that liquids found in containers on the kitchen floor contained sulfuric acid, toluene, xylene, methamphetamine, and pseudoephedrine hydrochloride. Other containers in the kitchen and in other rooms in the residence contained ephedrine and pseudoephedrine. The chemist explained that many of the chemicals discovered in Mr. Evans's residence and on his property were either used in making methamphetamine or produced during the manufacturing process.

Agent Holsinger also interviewed Mr. Evans. Agent Holsinger testified at trial that, during this interview, Mr. Evans admitted manufacturing methamphetamine at the residence for the previous six months. Mr. Evans also

acknowledged that he had used the tanks on his property to store anhydrous ammonia, that he had traded methamphetamine in exchange for anhydrous ammonia, and that he owned all of the items that the agents had discovered.

The government charged Mr. Evans and his wife with a variety of drug and weapon-related offenses. Subsequently, on October 16, 2000, Agent Holsinger and deputies from the Cherokee County sheriff's department went to another location—a trailer where Mr. Evans then resided—to arrest him and to serve another warrant. When no one answered the door, the officers entered and discovered Mr. Evans hiding under a blanket on a bed. Mr. Evans told the officers that the trailer contained methamphetamine as well as a variety of items used to manufacture it. The officers found glassware containing residue and liquids, a Pyrex dish, filters, a funnel, acetone, a plastic beaker with cloudy liquid, a paper bag with numerous empty packages of pseudoephedrine, and two firearms.

The government filed a superseding indictment, adding charges arising out of evidence discovered at the trailer. At trial, Mr. Evans did not contest the government's evidence that he had possessed listed chemicals and had manufactured methamphetamine. However, Mr. Evans did contest the government's assertion that he had attempted to produce more than fifty grams of the drug. Mr. Evans also challenged the weapons charges, arguing that the

-6-

weapons had no connection to the methamphetamine-related conduct. Additionally, Mr. Evans contested the § 858 charge—contending that he had not created a substantial risk to human life in the manner in which he had attempted to manufacture methamphetamine. Finally, Mr. Evans asserted that his wife was not at all responsible for manufacturing methamphetamine.

During trial, the district court granted Mr. Evans's motion for a judgment of acquittal on the conspiracy charge and one of the weapons charges. The jury acquitted Mr. Evans of another weapons charge but convicted him on the remaining counts.

After the jury returned its verdict, the district court concluded that the evidence was not sufficient to establish that Mr. Evans had attempted to make over fifty grams of methamphetamine. Accordingly, as to that charge, the court held that Mr. Evans was guilty of the lesser included offense of intending to manufacture methamphetamine in an unspecified amount, a violation of 21 U.S.C. § 841(a)(1).

For purposes of sentencing, the court grouped Mr. Evans's convictions. It sentenced him to a total term of imprisonment of 135 months.

## I. DISCUSSION

### A. Vagueness challenge to § 858

Mr. Evans first challenges his conviction under 21 U.S.C. § 858 on vagueness grounds. He focuses on the statute's prohibition of "creat[ing] a substantial risk of harm to human life" while manufacturing or attempting to manufacture a controlled dangerous substance. The district court rejected Mr. Evan's challenge. Because the constitutionality of a statute is a legal question, we review its decision de novo. See United States v. Saffo, 227 F.3d 1260, 1267 (10th Cir. 2000).

Section 858 provides:

> Whoever, while manufacturing a controlled substance in violation of this subchapter, or attempting to do so, or transporting or causing to be transported materials, including chemicals, to do so, creates a substantial risk of harm to human life shall be fined in accordance with Title 18, or imprisoned not more than 10 years, or both.

21 U.S.C. § 858 (emphasis added).

According to Mr. Evans, a person of ordinary intelligence would not reasonably understand what specific conduct is prohibited by the statute. Thus, he argues, it is unclear from the statute's terms what sort of "risk to human life" must be proved: the risk could be physical, emotional, or mental. It is also not clear what persons are protected by the statute: conceivably, those who injure

-8-

themselves while manufacturing methamphetamine could be prosecuted. Finally, it is unclear what kinds of acts are prohibited. Mr Evans notes that a "substantial risk to human life" could be created by a variety of acts, including stealing chemicals in order to manufacture methamphetamine, mixing chemicals, or (as the government alleges here) carelessly storing them. Thus, he concludes, the statute does not clearly identify prohibited conduct apart from merely manufacturing methamphetamine.

Mr. Evans's vagueness challenge is based upon the fundamental due process principle that a statute must clearly define the conduct that it prohibits. United States v. Reed, 114 F.3d 1067, 1069-70 (10th Cir. 1997) (citing Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)). That principle serves several important values. Grayned, 408 U.S. at 108. "First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Id. Second, "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Id. at 108-09.

Nevertheless, as the district court recognized, there are significant limitations on the application of these due process principles when the challenged

statute does not implicate First Amendment values. In that context, "[a] vagueness challenge . . . cannot be aimed at the statute on its face but must be limited to the to the application of the statute to the particular conduct charged." Reed, 114 F.3d at 1070; see also United States v. Evans, No. 00-40082-01-RDR, 2001 WL 1013322, at * 1 (D. Kan. Aug. 7, 2001) ("Vagueness challenges outside the context of the First Amendment are to be examined in light of the facts of the case, on an as-applied basis."). That limitation is applicable here. Because Mr. Evans has not argued that First Amendment interests are implicated, we must assess his vagueness challenge to § 858 as applied to the facts of this case.

In that regard, the record reveals that the district court significantly limited the scope of § 858's "substantial risk to human life" provision in several respects. First, the court granted a motion in limine filed by Mr. Evans, ruling that the government could not satisfy the "substantial risk to human life" element of the statute merely by proving that weapons were present at Mr. Evans's residence. Additionally, in instructing the jury on the elements of § 858, the court informed the jury that the "substantial risk of harm" created by the defendant must be "to a human life other than the defendant's." Rec. vol. I, doc. 106, no. 12 (Jury Instr., filed June 5, 2001). Moreover, the court informed the jury that the risk to human life must have "originated from the process of manufacturing methamphetamine or the storage, transportation or mixing of chemicals to

manufacture methamphetamine." Id.  Finally, the court explained that

"'substantial' means real and significantly large" and that "'harm' refers to

physical damage." Id.[2]

The district court's definitions undermine Mr. Evans's vagueness

challenge.  Contrary to Mr. Evans's suggestions, he was not subjected to

prosecution under § 858 for creating a danger to himself or for inflicting a mental

or emotional harm.  Moreover, the evidence and the instructions to the jury rebut

Mr. Evans's contention that, as applied here, "[t]he statute simply does not

distinguish  prohibited conduct apart from the § 841 conduct of methamphetamine

manufacture." Aplt's Br. at 12.  Instead, the government's application of § 858

focused on the creation of physical danger arising out of the manufacture of

methamphetamine or the storage, transportation, or mixing of chemicals used to

produce the drug.

Mr. Evans's argument is further undermined by the specific arguments that

the parties advanced at trial.  In particular, in arguing that it had established a §

---

[2] The court instructed the jury that the government had to prove the following elements beyond a reasonable doubt in order to convict Mr. Evans of violating § 858: (1) that he "manufactured or attempted to manufacture methamphetamine in the District of Kansas on or about the 12th day of August 2000;" (2) that, while doing so, he "created a substantial risk of harm to a human life other than [his own]"; and (3) that "the risk originated from the process of manufacturing methamphetamine or the storage, transportation or mixing of chemicals to manufacture methamphetamine." Rec. vol. I doc. 106, no. 12.

-11-

858 violation, the government focused on the way in which Mr. Evans had stored the chemicals. Inside the residence, the government noted, "[t]he chemicals in the kitchen were not on shelves, they were not on counters. They were on the floor where anybody, anybody could have walked up and stuck their finger in or drank it, anybody who didn't know better." Rec. vol. XIV, at 352 (Trial Tr., dated June 5, 2001). The government added that the storage tanks outside the residence were not fenced in and were not placed in a locked storage shed, "despite the obvious risks that they posed." Id. Then, the government reminded the jury that there were minor children living in the Evans's residence and cited testimony from a government chemist regarding the dangers of anhydrous ammonia and several of the chemicals found on the kitchen floor. See id. at 401. ("[W]hen is the last time you trusted a 9, 11, or 12 year-old with a whole bunch of dangerous chemicals, especially anhydrous? When is the last time you stored them on your kitchen floor? The fact is that by keeping these things out in the open and by using them to manufacture methamphetamine, [Mr. Evans] created a substantial risk, a significantly large risk of harm defined as physical harm to human life."). In response, Mr. Evans's counsel argued that the chemicals in question were legal to possess, that the government had presented no evidence that there were any particular risks presented by the process of mixing these chemicals together, and that there was also no evidence that anyone had been

actually injured as a result of the manner in which Mr. Evans stored the chemicals.

These arguments evince neither a lack of clarity about key statutory terms nor a risk that those terms would be applied on an ad hoc or subjective basis, "with the attendant dangers of arbitrary and discriminatory application." Grayned, 408 U.S. at 109. Instead, as applied by the district court and the parties in this case, the terms of § 858 allowed the jury to resolve a factual dispute by applying a reasonably clear standard—whether Mr. Evans's storage of the chemicals on the kitchen floor and in unfenced tanks outside the residence created a risk of physical injury to other people, particularly his three minor children.

That conclusion is further supported by cases from other jurisdictions rejecting vagueness challenges to statutes containing similar terms. For example, in Panther v. Hames, 991 F.2d 576 (9th Cir. 1993), the Ninth Circuit held that the term "substantial risk" in an Alaska statute concerning criminally negligent homicide did not violate due process. Similarly, in State v. Anspach, 627 N.W.2d 227, 231-233 (Iowa 2001), the court rejected a challenge to a child endangerment statute that held an adult culpable for knowingly acting "in a manner that creates a substantial risk to a . . . minor's physical, mental or emotional health or safety." Id. at 232. The court noted that "[t]he phrase substantial risk . . . has been heavily defined in other contexts and enjoys a fairly ascertainable meaning." Id.;

see also State v. Mahurin, 799 S.W. 2d 840, 842 (Mo. 1990) (en banc) (rejecting challenge to a child endangerment statute and reasoning that "[t]he words 'substantial risk' have a plain and ordinary meaning cognizable by a person of ordinary intelligence").[3] We agree.

Accordingly, we conclude that the district court properly rejected Mr. Evans's vagueness challenge to § 858, as applied to the facts of this case. Here, § 858 provided Mr. Evans with fair warning of the prohibited conduct and did not present an undue risk of arbitrary or discriminatory enforcement.

---

[3] As Mr. Evans observes, the fact that a particular statute contains a mens rea element may militate against a finding of vagueness. See, e.g.,Village of Hoffman Estates v. Flipside, Village of Hoffman Estates, Inc., 455 U.S. 489, 499 (1982) ("[T]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."); United States v. Gaudreau, 860 F.2d 357, 360 (10th Cir.1988) ("[A] scienter requirement may mitigate a criminal law's vagueness by ensuring that it punishes only those who are aware their conduct is unlawful.") (citing Screws v. United States, 325 U.S. 91, 101-04 (1945) (plurality opinion)); Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 2.3, at 130 (1986) ("Not infrequently the Supreme Court, in passing upon a statute claimed to be unconstitutional for vagueness, has concluded that the statute gives fair warning because scienter is an element of the offense."). Here, the district court did not read a particular scienter requirement into § 858, and the parties do not argue that such a requirement exists.

Nevertheless, we agree with the district court that lack of a mens rea element in the instructions here does not render the statute unduly vague as applied. As noted above, the district court's definitions of key terms, the evidence presented at trial, and the focused arguments of the parties establish that § 858 did not violate due process vagueness standards.

-14-

## B. Sufficiency of evidence supporting § 858 conviction

Mr. Evans also argues that, even if § 858 is not void for vagueness, the evidence is still insufficient to support his conviction under that statute. In support of that argument, he observes that chemicals that he possessed (excluding methamphetamine) were legal substances with innocent purposes (such as maintaining farm machinery and painting). He adds that the most dangerous chemical, anhydrous ammonia, was stored outside the residence. As a result, he contends, there is insufficient evidence that he created a substantial risk to anyone but himself.

We examine challenges to the sufficiency of the evidence de novo, viewing all evidence and drawing all reasonable inferences in the light most favorable to the government. United States v. Oliver, 278 F.3d 1035, 1043 (10th Cir. 2001). We limit our inquiry to determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis omitted). In reviewing the evidence, we do not weigh conflicting evidence or consider witness credibility, as these duties are delegated exclusively to the jury. United States v. Castorena-Jaime, 285 F.3d 916, 933 (10th Cir. 2002). Instead, "[w]e presume that the jury's findings in evaluating the credibility of each witness are correct." Tapia v. Tansy, 926 F.2d 1554, 1562 (10th Cir. 1991).

In light of these standards, we conclude that the evidence is sufficient to support Mr. Evans's § 858 conviction. As noted above, Agent Holsinger testified that Mr. Evans's kitchen floor contained numerous containers of chemicals and that tanks outside the residence had contained anhydrous ammonia. Agent Holsinger also testified that he smelled ammonia when he first entered the residence on August 13, 2000. A DEA chemist identified two of the substances in the containers of the kitchen floor as sulferic acid and toluene. She explained that toluene is flammable, may be fatal if swallowed or inhaled, and should be kept away from eyes, skin, and clothing. The chemist also testified about the serious health risks of exposure to ammonia, including mucous membrane burns, respiratory irritation, skin irritation, and eye irritation. Viewed in the light most favorable to the government, a jury could reasonably conclude that Mr. Evans's manufacture and attempted manufacture of methamphetamine created a substantial risk of injury to the other occupants of the household.

### C. Application of USSG § 2D1.10

Mr. Evans contends that the district court erred in applying the Sentencing Guidelines to determine his sentence. He maintains that the court should have applied USSG § 2D1.1 rather than § 2D1.10. A brief review of the district court's methodology is necessary to understand Mr. Evans's argument.

Mr. Evans was convicted of five offenses: (1) manufacture of methamphetamine on August 13, 2000 (statutory maximum: 20 years); (2) possession of a listed chemical on August 13, 2000 with intent to manufacture methamphetamine (statutory maximum: 20 years); (3) creating substantial risk of harm to human life while manufacturing and attempting to manufacture methamphetamine (statutory maximum: 10 years); (4) attempted manufacture of methamphetamine; (statutory sentence: not less than 5 years and not more than 40 years); and (5) possession of a listed chemical on October 16, 2000 with intent to manufacture methamphetamine, a violation of 21 U.S.C. § 841(d) (statutory maximum: 20 years).

On the first, second, fourth and fifth of these offenses, the district court imposed terms of imprisonment of 135 months. On the third offense (the § 858 conviction) the court imposed a sentence of 120 months. The court ordered the sentences to run concurrently.

The district court's determination of the sentence was based on the grouping rules of the Sentencing Guidelines. In particular, under § 3D1.2, the court concluded that all the counts of conviction involved substantially the same harm and should therefore be grouped together into a single count for sentencing purposes.

Nevertheless, even though the counts of conviction involved the same

-17-

harm, two different guidelines applied: (1)  USSG § 2D1.1, commonly referred to as the Drug Quantity Table; and (2)  USSG § 2D1.10.  The district court applied the first of these guidelines, the Drug Quantity Table, to all the counts except the § 858 conviction.  The Drug Quantity Table establishes offense levels based on the type of drug involved and the quantity for which the defendant is responsible.  Here, based on the amount of methamphetamine involved—165.5 grams—the district court determined that the offense level was thirty-two.  The district court applied the second applicable guideline, § 2D1.10,  to the § 858 conviction.  Section 2D1.10(a)(1) establishes an offense level of three plus the offense level provided in § 2D1.1.  Because the district court determined that the offense level under § 2D1.1 (based on the total amount of methamphetamine involved) was thirty-two, the court set the offense level for Mr.Evans's § 858 conviction at thirty five (32 plus 3).

The district court then applied a specific provision of the Guideline's grouping rules—§ 3D1.3(b)—to determine which of these two offense levels should be applied to the entire group of  Mr. Evans's convictions.  Section 3D1.3(b) provides:

> In the case of counts grouped together pursuant to §3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three. <u>When the counts involve offenses of the same general type to which different</u>

> **guidelines apply, apply the offense guideline that produces the highest offense level.**

(emphasis supplied). Because § 2D1.10 produced the highest offense level (thirty-five rather than thirty-two), the district court concluded that § 2D1.10 should be applied to Mr. Evans's grouped counts and that the offense level for the grouped counts should be thirty-five. The district court then applied that offense level to Mr. Evans's criminal history category (I) and obtained a Guideline range for the grouped counts.

In this appeal, Mr. Evans argues that the district court erred in applying § 2D1.10 to establish an offense level of thirty-five and that the court should have established an offense level of thirty-two under USSG § 2D.1.1. He maintains that thirty-five is not an appropriate offense level to use because § 858 has a statutory maximum sentence of 10 years (120 months). He maintains that if one uses an offense level of 35, as did the district court, then the sentencing range for a defendant with a criminal history category of I is 168 to 210 months, well in excess of the ten year cap set by the statute.

In support of this reasoning, Mr. Evans cites a Ninth Circuit case, United States v. Brinton, 139 F.3d 718 (9th Cir. 1998). There, in applying the grouping provisions of the guidelines, the court stated that the sentencing judge should apply the guideline with "the potential to produce the highest offense level." Id.

at 722. By the "potential" to produce the highest offense level, the Ninth Circuit apparently meant the offense with the highest statutory maximum. See id. (citing the statutory maximums and concluding that the offense with the highest statutory maximums should be used).

In response to Mr. Evans's argument, the government cites an Eighth Circuit case that expressly rejects the Ninth Circuit's reasoning in Brinton. In United States v. Kroeger, 229 F.3d 700 (8th Cir. 2000), the court concluded that the Ninth Circuit's decision was based on an incorrect reading of the Guidelines:

> When counts are grouped, the "most serious" of the grouped counts sets the offense level for the group. But the most serious count is not the count with the greatest available maximum statutory term of imprisonment; it is the count with the highest offense level.
>      In concluding that the count with the greatest statutory maximum sentence had the potential to produce the highest offense level, the Brinton court went astray: the statutory maximum may cap the Guidelines imprisonment range, but it has no effect on the offense level. The Ninth Circuit's analysis also overlooked the fact that when a defendant is sentenced on multiple counts, the statutory maximum for any one count does not cap the total punishment he can receive.

Kroeger, 229 F.3d at 703 (citations omitted and emphasis added).

We agree with the reasoning of the Eighth Circuit   The relevant section of the grouping provision of the Guidelines directs the district court to apply the Guideline with the highest offense level, see USSG § 3D1.3(b) (stating that "[w]hen the counts involve offenses of the same general type to which different

guidelines apply, apply the offense guideline that produces the highest offense level"). Here, the district court properly interpreted § 3D1.3(b) by selecting the guideline that produced the higher offense level—USSG § 2D1.10, which established an offense level of thirty-five. Accordingly, we find no error in the district court's application of the Guidelines.[4]

### D. Sufficiency of evidence of proper venue

Finally, Mr. Evans argues that the district court erred in denying his motion for a judgment of acquittal on counts six and seven of the indictment. Those counts (attempted manufacture of methamphetamine and possession of ephedrine and pseudoephedrine with the intent to manufacture methamphetamine) concern the evidence discovered by law enforcement agents at Mr. Evans's trailer on October 16, 2000. Mr. Evans contends that the prosecution never proved that the trailer was located in the District of Kansas, and that, as a result, the evidence is

---

[4] We also note that at one point in his argument Mr. Evans suggests that the district court exceeded the statutory maximum—120 months—in sentencing Mr. Evans on the § 858 conviction. That is not the case. As noted above, the court sentenced Mr. Evans to 120 months on the § 858 conviction. Other counts of conviction involved greater maximum sentences, and the fact that Mr. Evans's total sentence was higher than 120 months resulted from his conviction for these other offenses, as well as a proper application of the grouping provisions of the Guidelines. Like the Ninth Circuit's reasoning in Brinton, Mr. Evans's argument overlooks "the fact that when a defendant is sentenced on multiple counts, the statutory maximum for any one count does not cap the total punishment he can receive." Kroeger, 229 F.3d at 703.

-21-

insufficient to establish venue as to these two counts.

As a general rule, our review of challenges to evidence of proper venue is quite deferential. "The standard of review for whether venue lies in a particular district is whether, viewing the evidence in the light most favorable to the Government and making all reasonable inferences and credibility choices in favor of the finder of fact, the Government proved by a preponderance of direct or circumstantial evidence that the crimes charged occurred within the district." United States v. Rinke, 778 F.2d 581, 584 (10th Cir. 1985). Thus, the question before us is whether, viewing the evidence in the light most favorable to the government, a reasonable juror could have concluded by a preponderance of the evidence that the trailer in which Mr. Evans was residing on October 16, 2000 was located in the District of Kansas.

Our review of the record indicates that the prosecutor told the jury in his opening statement that "[o]n October 16, 2000, Agent Holsinger went to the Evanses' new residence in a trailer in Chetopa in Cherokee County, Kansas. The Evanses were living at this trailer that was parked on the property there." Rec. vol. X, at 20. (Trial Tr., dated May 24, 2001).

In spite of the prosecutor's description, the record before us provides no indication that the jury ever heard any direct evidence as to where the trailer was located. Indeed, the only testimony explaining how law enforcement agents came

-22-

to the trailer was provided by Agent Holsinger. He stated that, on October 16, 2000, he went to the trailer accompanied by another agent and one or two deputy sheriffs from Cherokee County, Kansas. However, neither Agent Holsinger nor any other witness identified by the government provided any testimony about a specific location.

In objecting to Mr. Evans's motion for a judgment of acquittal, the government argued that there was sufficient circumstantial evidence in the record to establish by a preponderance of the evidence that the trailer was in Kansas. In particular, the government stated that "[f]rom the first lab, the jury knew that the Evanses resided in Cherokee County, Kansas, and could have reasonably inferred, from the presence of Cherokee County sheriff's deputies at the second lab, that it was also in Cherokee County, Kansas." Rec. vol. I, doc. 124, at 3. (Gov't Resp., dated June 27, 2001). The government did acknowledge that "no specific evidence relating to the exact location of the Evans' trailer was elicited from Agent Holsinger on direct examination by the government." Id. at 2.

In denying Mr. Evans's motion for a judgment of acquittal, the district court accepted the government's characterization of this circumstantial evidence, stating that the fact that Cherokee County, Kansas deputy sheriffs accompanied Agent Holsinger to the trailer on October 16, 2000 established that the trailer was located in Kansas:

The evidence further established that Cherokee County [Kansas] law enforcement officers and an agent of the Kansas Bureau of Investigation arrested the defendant and searched his property again on or about October 16, 2000 at a different location. There was no evidence that law enforcement officers from any other state investigated the charges in this case. In October, the officers found more methamphetamine related materials in a trailer in which the defendant appeared to be living. They also found the defendant's Kansas driver's license. The government has represented, without rebuttal, that the materials which were sent away for lab analysis were marked with stickers indicating "Cherokee County, Ks" and notations relating to this case. The lab analysis for all the suspected drug materials that were collected were referred back to an agent of the Kansas Bureau of Investigation. For the above-stated reasons, we believe a juror could reasonably infer from the whole of the evidence, including the actions and involvement of the Kansas law enforcement officers in October (when the events charged in Counts 6 and 7 occurred) that the crimes occurred in the District of Kansas.

Evans, 2001 WL 1013322 at * 3.

In our view, the entirely circumstantial evidence cited by the government and the district court is insufficient to establish, even by a preponderance of the evidence and viewed in the light most favorable to government, that the trailer was located in the District of Kansas. In effect, the district court applied a presumption that law enforcement officers of a particular jurisdiction act within that jurisdiction. It may well be true that in most cases deputy sheriffs and other law enforcement officials—like the ones that searched Mr. Evans's property on October 16, 2000— act within the boundaries of the jurisdiction that employs

-24-

them.  However, the district court did not cite, nor are we aware of, any rule of law that establishes such a presumption.

Indeed, this circuit has rejected the government's attempts to rely on presumptions to establish proper venue.  See Jenkins v. United States, 392 F.2d 303, 306 (10th Cir. 1968) (concluding that "[a] presumption suitable to support venue in Kansas . . . did not arise from appellant's possession in Oklahoma of property recently stolen in Kansas . . . in the absence of proof that he was in Kansas at any pertinent time.  There is not a sufficient relationship between the fact of possession in Oklahoma and the circumstance sought to be presumed—receiving and possessing [property] in Kansas").  Moreover, several state courts have expressly refused to adopt the presumption that the government seeks to apply here.  See Sutherland v. Commonwealth, 368 S.E.2d 295, 297 (Va. Ct. App. 1988) ("The mere fact that police of a certain jurisdiction investigate a crime cannot support an inference that the crime occurred within their jurisdiction."); Black v. State, 645 S.W.2d 789, 791 (Tex. Crim. App. 1983) (concluding that testimony that police officers worked for a certain police department was insufficient to establish venue); People v. Manley, 552 N.E.2d 1351, 1353 (Ill. App. Ct. 1990) (stating that "the only indication in the stipulation that Macon County was involved was the statement that the seizure of the contraband evidence at the scene of the crime was made by Decatur police

-25-

officers" and that "[t]hat, of itself, was insufficient to prove venue").

Accordingly, we conclude that the evidence is insufficient to establish by a preponderance of the evidence that the offenses set forth in counts six and seven of the indictment occurred in the district of Kansas.  Accordingly, we will remand this case to the district court with instructions to vacate Mr. Evans's convictions on those counts and for further proceedings consistent with this opinion.

### III.  CONCLUSION

We AFFIRM Mr. Evans's conviction under 21 U.S.C. § 858.  We further conclude that the district court properly applied the grouping provisions of the Guidelines.  However, the government failed to offer sufficient evidence to establish that the offenses charged in counts six and seven of the indictment occurred in the District of Kansas.  Accordingly, we REMAND this case to the district court with instructions to VACATE those convictions and for further proceedings consistent with this opinion.