FILED
United States Court of Appeals
Tenth Circuit

October 14, 2016

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

POLLY HOPPER,

    Defendant - Appellant.

No. 15-2194
(D.C. No. 2:14-CR-02130-KG-3)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **BALDOCK**, and **MORITZ**, Circuit Judges.
_____

Following a jury trial, Polly Hopper was convicted of kidnapping and

conspiracy to commit kidnapping in violation of 18 U.S.C. §§ 371 and 1201.

Ms. Hopper appeals her conviction and sentence, arguing that her trial should have

been severed from her co-defendants, that there is insufficient evidence to support the

conviction on both counts, and that her sentence is substantively unreasonable.

Exercising jurisdiction under 28 U.S.C. § 1291, we reject these challenges and affirm

Ms. Hopper's conviction and sentence.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I

After separating from his wife Melissa in March or April 2014 and leaving her and his two sons in Arkansas, Jessie Hopper Jr. moved in with his grandmother, father (Jessie Sr.), and aunt (Polly) in Deming, New Mexico.[1]  Upon learning that Melissa had a boyfriend, Jessie Sr. told Jessie Jr. that Melissa should be with him and his children should not be calling another man "Daddy."  Polly was not present for this conversation but was for a conversation later that day wherein "she was talking to [Jessie Sr.] about" showing Jessie Jr. "how to get your kids and your wife."  Suppl. R., Vol. 1 at 472–74.  Jessie Jr. testified that the initial plan was to take a van to Arkansas and bring back his children, but it was modified to include Melissa because Jessie Sr. wanted her, too.  At Jessie Sr.'s instruction, Jessie Jr. told Melissa that Polly had died because he did not believe she would get in the van if Polly were there, as Melissa and Polly "didn't like each other."  *Id*. at 475.  Jessie Jr. testified that Polly went along with the plan to "make her brother happy," *id*. at 473, and to "torture" Melissa, *id*. at 587.

The Hoppers only owned a pickup truck at the time, so the use of a van required its purchase.  Polly noted May 6 in her calendar as the date they planned to go look for a van.  The van was purchased for at least two purposes: picking up Melissa and her children in Arkansas and providing a vehicle for Jessie Jr.'s grandmother, who was unable to drive the truck.  Polly went to Las Cruces with

---

[1]  At times, we will refer to the actors in this case by their first names to avoid confusion.

Jessie Sr. and their mother to purchase the van, but Jessie Sr. "call[ed] the shots," paying the down payment for the van and signing for it along with his mother. *Id*. at 83–84, 480–81. Polly sat at the dealership and did not go on the test drive. They brought it back to Deming that day.

On May 7, the Hoppers drove to Arkansas, stopping first in Morrilton at a pawn shop and the house of the pawn shop's former owner, where Polly retrieved the title to the pickup truck and some money. Polly paid for gas on the first leg of the trip and used the money she received in Morrilton to pay for gas on the return leg. After Polly obtained the title, the Hoppers drove to a park in Hot Springs, where, with Melissa being under the impression Polly was dead, Polly waited in hiding in rainy weather while Jessie Sr. and Jessie Jr. met with Melissa and the children. Jessie Jr. surprised Melissa with the van, telling her that they bought it for her and the children. Jessie Sr. told Melissa he was dying from cancer and asked her to pick a restaurant where they could sit down and visit. After briefly stopping by her home to change, Melissa got in the van with the Hoppers, but Jessie Sr. turned back toward the park claiming he forgot something.

Just before they reached the park, Jessie Sr. stopped the van and Polly got in. Immediately realizing something was awry, Melissa said, "Oh, my God, let me go," and screamed at Jessie Jr., "JJ, really?" *Id*. at 698. Jessie Jr. testified that Melissa told Polly, "I'm going to kill you, Bitch." *Id*. at 503. According to Melissa, Polly gave her a "weird eerie smile" and said, "They got you." *Id*. at 698. According to Jessie Jr., Polly said, "You're not going to get the chance. Got you now." *Id*. at 503.

3

Melissa "[f]reaked out" and requested to get out of the van, but the doors were locked and she was handcuffed. *Id*. at 698–99. Polly was in the passenger seat. Jessie Jr. said that his father and aunt "didn't think [he] had the balls to go through with it," and put a sawed-off shotgun in Melissa's face, telling her to shut up. *Id*. at 700–01. Melissa testified that Polly's demeanor was cold and that she did not "see how [Polly] could not have" seen the shotgun. *Id*. at 835. Jessie Sr. and Jessie Jr. told her that, where they were going, "nobody would ever know where [she] was at." *Id*. at 705. Melissa "gave up." *Id*.

By May 9, they arrived at a Sam's Club in Las Cruces, where Melissa was uncuffed and told not to cause a scene. All three Hoppers accompanied Melissa into the store and she was permitted to use the restroom, but Polly was standing outside of her stall waiting for her. Polly asked her whether she talked to anybody and Melissa responded, "No." *Id*. at 712. They exited the restroom together and walked around Sam's, where Jessie Jr. reminded Melissa not to cause a scene. When the Hoppers got back on the road to Deming, they approached a border patrol checkpoint. Jessie Sr. told Melissa not to make any gestures or draw attention to the vehicle while Jessie Jr. sat with the shotgun on his lap under a jacket. Jessie Sr. also threatened to kill Melissa if she made a scene. Upon arriving in Deming, they stopped at a Wal-Mart but Melissa was not permitted to go inside. Polly went inside first and then came back out to monitor Melissa in the van while the men went inside. While they were alone in the van, Melissa asked Polly why she would not let her go. According to Melissa, Polly replied, "Because JJ wanted you." *Id*. at 719. At some point on

4

May 9, while the Hoppers were in transit, Melissa's cousin filed a missing person report.

Around dusk, they arrived at the Hoppers' property, which included a bus in which Jessie Sr. and Jessie Jr. lived and a "house trailer" where Polly lived with her mother. Melissa was brought to the bus, where she was forced by the men to clean the living area and feed her children, and was repeatedly sexually assaulted over the course of the next 24 hours. There is no evidence Polly was present in the bus for these events. On the second day, Melissa asked for some bottoms because a nightgown Jessie Sr. had purchased showed "everything" when she bent over. *Id*. at 729. Polly brought her some of her own clothes so she would have something to wear. At some point, Jessie Jr. instructed Melissa to leave messages for family members so they do not worry, allowing a ping signal on Melissa's phone to be traced to the Hopper residence.

At the request of the Hot Springs sheriff's office, two New Mexico State Police officers were dispatched to the property, where, upon seeing a van matching the description of the van the Hoppers drove to Arkansas, the officers stopped nearby and called for backup. Before other officers arrived, Jessie Sr. approached the officers, as Polly had phoned him to inform him that there were police officers at the property gate and to "make everybody be quiet." *Id*. at 735. The officers approached the bus to perform a welfare check on Melissa and the men told her to tell the officers everything was fine. The officers took Melissa further away from the bus and asked her if she was being held against her will; she said that she was. Polly was sitting

5

outside in a golf cart. The officers arrested Jessie Sr. and Jessie Jr. while Polly asked whether "we [were] going to jail." *Id*. at 739. Polly was arrested shortly thereafter.

Jessie Sr., Jessie Jr., and Polly were all indicted and charged with conspiracy to commit kidnapping in violation of 18 U.S.C. § 371 and kidnapping in violation of 18 U.S.C. §§ 2 and 1201. The two men were also charged with firearms offenses. Jessie Jr. pleaded guilty to five of six counts in a superseding indictment. Polly filed a motion to sever her trial, arguing that Jessie Jr.'s duress defense would be antagonistic with Polly's defense that she was not part of any conspiracy. The district court denied the motion because, upon pleading guilty, Jessie Jr. became a government witness, leaving no conflict with Polly's defense. Polly renewed her motion at a pretrial conference, arguing that she would be prejudiced by evidence that Jessie Sr. and Jessie Jr. sexually assaulted Melissa. The district court again denied the motion, holding that jury instructions would be sufficient to ensure each defendant was considered individually.

Jessie Sr. and Polly were tried and found guilty by a jury as charged. A presentence report calculated Polly's total offense level as 38 with a criminal history category of III, yielding a guidelines range of 292 to 365 months. Polly requested a downward variance. The district court sentenced her to 292 months' imprisonment.

**II**

Ms. Hopper raises four challenges to her conviction and sentence: (1) the district court abused its discretion when it denied her motion to sever; (2) the evidence was insufficient to convict her of conspiracy; (3) the evidence was

6

insufficient to convict her of kidnapping; and (4) her sentence was substantively unreasonable. We address each claim in turn.

## A

Ms. Hopper argues that the substantial graphic evidence detailing the sexual assault of Melissa was irrelevant to her case and prejudicial, as no "reasonable jury would be able to overlook not one, but two defendants, forcibly repeatedly raping the victim of a kidnapping." Opening Br. at 11.

Federal Rule of Criminal Procedure 8(b) "permits an indictment to charge two or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses," consistent with the "preference in the federal system for joint trials of defendants who are indicted together." *United States v. Pursley (Pursley II)*, 577 F.3d 1204, 1215 (10th Cir. 2009) (internal quotation marks omitted). Rule 14(a) vests a district court with the authority to "sever the trials of more than one defendant if joinder appears to prejudice a defendant or the government." *Id.* (internal quotation marks omitted). A trial court "should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "That risk is present when the jury considers evidence against a defendant that is admissible only against a co-defendant," however, "neither a mere allegation that defendant would have a better chance of acquittal in a separate trial nor an argument that evidence

7

against one defendant would have a spillover effect on another defendant demonstrates prejudice." *United States v. Clark*, 717 F.3d 790, 818 (10th Cir. 2013) (internal quotation marks omitted).

"The district court is the primary referee on severance claims, for we, as an appellate court, have only a distant view of the ring." *Id*. "Rule 14 leaves the determination of risk of prejudice and any remedy for such prejudice to the sound discretion of the district court," *United States v. Morales*, 108 F.3d 1213, 1220 (10th Cir. 1997), leaving us to review the district court's denial of a motion to sever only for an abuse of that discretion, *Pursley II*, 577 F.3d at 1215.

The district court did not abuse its discretion in refusing to sever the trials. Ms. Hopper's argument focuses on the concern of a "spillover effect" that we have held is an insufficient basis to sever a trial. *See Clark*, 717 F.3d at 818. As the government argues, evidence relating to the sexual assaults would have been admissible against Ms. Hopper in a separate trial as evidence of the conspiracy and overt acts in furtherance of the conspiracy. Further, it would also be relevant to Ms. Hopper's statement describing why she would not let Melissa go—"Because JJ wanted you." Suppl. R., Vol. 1 at 719. This evidence is not "admissible only against a co-defendant," *see Clark*, 717 F.3d at 818, and thus does not create the risk of prejudice contemplated by the Supreme Court in *Zafiro*. None of Ms. Hopper's arguments point to a risk of prejudice that would weigh against the preference that persons charged together be tried together in a conspiracy trial. *See United States v.*

*Scott*, 37 F.3d 1564, 1579 (10th Cir. 1994).  We therefore discern no abuse of discretion in the district judge's denial of the motion to sever.

**B**

Ms. Hopper argues that the government presented insufficient evidence that she agreed to kidnap Melissa, committed an overt act in furtherance of the conspiracy, did so knowingly and voluntarily, and acted with the coconspirators for mutual benefit.  She also contends that the government presented insufficient evidence that she kidnapped Melissa for ransom, reward, or otherwise, and that she did so knowingly and willfully.  She raised these issues in a motion for judgment of acquittal.

> In reviewing the sufficiency of the evidence and denial of a motion for judgment of acquittal, this court reviews the record de novo to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt.

*United States v. Irvin*, 682 F.3d 1254, 1266 (10th Cir. 2012).  We consider "the entire record, including both direct and circumstantial evidence, together with the reasonable inferences to be drawn from it."  *United States v. Mendez*, 514 F.3d 1035, 1041 (10th Cir. 2008).  We may not "weigh conflicting evidence" in conducting this inquiry.  *United States v. Evans*, 318 F.3d 1011, 1018 (10th Cir. 2003).  A conviction may be reversed only if "no reasonable juror could have reached the disputed verdict."  *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997).

**1**

"To convict a defendant under the general conspiracy statute, 18 U.S.C. § 371, the government must prove the following elements beyond a reasonable doubt: (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009) (internal quotation marks omitted). "During the conspiracy, at least one of the coconspirators must commit an overt act in furtherance of the conspiracy." *Id*. A "jury [can] infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *Carter*, 130 F.3d at 1439 (internal quotation marks omitted). "Interdependence exists where coconspirators intend to act together for their shared mutual benefit within the scope of the conspiracy charged." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (brackets and internal quotation marks omitted); *see also Wardell*, 591 F.3d at 1291 (noting that interdependence exists where a defendant "facilitated the endeavors" of other coconspirators or the venture as a whole).

Our review indicates that the evidence was more than sufficient to support Ms. Hopper's conspiracy conviction. Her agreement with her coconspirators can easily be inferred from her actions. *See Carter*, 130 F.3d at 1439. Ms. Hopper, along with Jessie Sr., told Jessie Jr. to "[w]atch and learn, . . . we're going to show you how to get your kids and your wife." Suppl. R., Vol. 1 at 472. Not only did Ms. Hopper

travel on a day-long van ride to Arkansas with two men who had a unified purpose for the trip, she helped accomplish that purpose by waiting in the rain, as the plan was devised with the knowledge that Melissa would not get in the van if Ms. Hopper were there. *See id*. at 490, 590–92. And when she boarded the van, she told Melissa some version of "got you" while displaying a "weird eerie smile." *See id*. at 503, 698. Ms. Hopper even obtained money for gas on the return leg of the trip, when Melissa and the children were held captive in the van. *Id*. at 483. Ms. Hopper's clearest actions from which we can infer an agreement came upon their return to New Mexico, where she accompanied Melissa into a restroom and waited outside the stall, inquiring whether Melissa had talked to anyone. *See id*. at 712. She also monitored Melissa in the van in the Wal-Mart parking lot, providing a reason why she was unwilling to release Melissa, *id*. at 719.

There are too many examples in the record of Ms. Hopper's assent to the conspiracy that cannot be explained away by her argument that she was merely going to Arkansas to retrieve the truck title. The truck title had nothing to do with Ms. Hopper's holding Melissa in the van at Wal-Mart. Even though the government need only prove an overt act by her coconspirators and not Ms. Hopper herself, *United States v. Pursley (Pursley I)*, 474 F.3d 757, 768 (10th Cir. 2007), any number of these acts would qualify as an overt act indicating her joining the conspiracy. The jury had no shortage of overt acts from which to choose here. Though Ms. Hopper argues that some of these acts could have been less than knowing and voluntary as under the duress of Jessie Sr., this argument is belied by Ms. Hopper's alerting Jessie

11

Sr. to the police presence accumulating outside of their gate in Deming. *See* Suppl. R., Vol. 1 at 735. That alert, along with watching Melissa in the van at Wal-Mart, also provides evidence to prove interdependence. There is plenty of evidence that Ms. Hopper "facilitated the venture as a whole." *See Wardell*, 591 F.3d at 1291.

In sum, there was sufficient evidence for any rational factfinder to determine that Ms. Hopper was a member of the charged kidnapping conspiracy. Accordingly, we reject her sufficiency-of-the-evidence challenge to the conspiracy charge.

## 2

To prove kidnapping, the government must show "(1) transportation in interstate commerce (2) of an unconsenting person who is (3) held for ransom, reward, or otherwise, (4) with such acts being done knowingly and willfully." *United States v. Walker*, 137 F.3d 1217, 1220 (10th Cir. 1998). As to ransom or reward, "the statute demands only that the holding of the kidnap victim fulfill some purpose desired by the captor." *United States v. Gabaldon*, 389 F.3d 1090, 1095 (10th Cir. 2004) (internal quotation marks omitted). To prove that a defendant aided and abetted a kidnapping, the government must show that the defendant willfully associated herself with the criminal venture and sought to make it succeed through some action of her own. *United States v. Rosalez*, 711 F.3d 1194, 1205 (10th Cir. 2013). Mere knowledge of the crime or presence at the crime scene is insufficient-there must be "some showing of intent to further the criminal venture." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1084 (10th Cir. 2004).

12

The evidence cited above is also more than sufficient evidence to support Ms. Hopper's kidnapping conviction. Ms. Hopper argues that the government failed to prove that she kidnapped Melissa for ransom, reward, or otherwise, and failed to prove that she "knowingly and willfully acted contrary to law by kidnapping or aiding and abetting the kidnapping." Opening Br. at 21. In support of her contentions, she asserts that Jessie Jr.'s testimony that she wanted to "make her brother happy" is inconsistent with his testimony that she wanted to "torture" Melissa, and is thus unreliable. The reliability of these statements, however, was weighed and decided by the jury. Far from being a change in testimony, as Ms. Hopper characterized it in her statement of the facts, *id.* at 5, Jessie Jr.'s statements are not inconsistent or mutually exclusive, *see* Suppl. R., Vol. 1 at 473, 587. Either statement served as a legitimate basis for the jury to conclude that Ms. Hopper derived a benefit from kidnapping Melissa. Additionally, Ms. Hopper's argument regarding her knowing and voluntary participation in the kidnapping fails for the same reasons it failed with regard to the conspiracy conviction.

Regardless, Ms. Hopper was indicted for both kidnapping and aiding and abetting a kidnapping in Count II, and the jury rendered a verdict on the whole of Count II. R., Vol. 1 at 32–33, 225. In light of all the actions Ms. Hopper took in furtherance of the conspiracy as set forth above, there was sufficient evidence to prove she intended to join the criminal venture and make it succeed as an abettor. *See Delgado-Uribe*, 363 F.3d at 1084. It is clear that a rational juror could have found Ms. Hopper guilty of both kidnapping and aiding and abetting a kidnapping

13

considering the evidence presented at trial. We reject her sufficiency-of-the-evidence challenge.

## C

Ms. Hopper contends that her sentence is substantively unreasonable because it is longer than necessary to accomplish the sentencing goals in 18 U.S.C. § 3553(a) and because the court did not properly consider the factors set forth in that statute. Specifically, she maintains that, at sixty-one, she suffers from multiple medical conditions (such as schizophrenia) and intellectual deficiencies that have allowed her to be easily controlled by Jessie Sr. for her entire life, and but for that controlling influence, Ms. Hopper "would not be facing the possibility of dying in a federal prison." Opening Br. at 24. She also notes that she was prostituted and beaten by her father when she was young. Ms. Hopper claims that even if the government's version of events were true, it is clear that her role "was minimal and possible under imperfect duress." *Id*. Ms. Hopper does not challenge the district court's calculation of her Sentencing Guidelines range and has marshaled no case law in support of her mental-faculty arguments.

We review the substantive reasonableness of a sentence for an abuse of discretion. *United States v. Martinez*, 610 F.3d 1216, 1227 (10th Cir. 2010). In this assessment, we determine "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009) (internal quotation marks omitted). There is a "range of possible outcomes" in sentencing proceedings

14

that "the facts and law at issue can fairly support," *United States v. McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007), so the fact that we might have reasonably imposed a different sentence does not warrant reversal of the district court, *see Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence "within the correctly calculated Guidelines range . . . may be presumed reasonable on appeal." *United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008). Ms. Hopper may rebut that presumption by demonstrating that the § 3553(a) factors justify a lower sentence, *see United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006) (per curiam), but we will find an abuse of discretion only if the district court rendered "a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Muñoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008) (internal quotation marks omitted).

We conclude that Ms. Hopper's arguments concerning her admittedly unfortunate circumstances do not rebut the presumption of reasonableness we afford the district court's within-Guidelines sentence. As part of its overall evaluation of the § 3553(a) factors, the district court conducted a reasonable assessment of Ms. Hopper's "history and characteristics," 18 U.S.C. § 3553(a)(1), and, in doing so, expressly considered her medical conditions and intellectual deficiencies. Mindful that the "sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than . . . the appeals court," *Rita v. United States*, 551 U.S. 338, 357–58 (2007), we defer to the district court's reasoned judgment as to the import of Ms. Hopper's mental-faculty issues for an appropriate

15

sentence, *see Koon v. United States*, 518 U.S. 81, 98 (1996) ("District courts have an institutional advantage over appellate courts in making [§ 3553(a)] determinations, especially as they see so many more Guidelines cases than appellate courts do."). Because Ms. Hopper has failed to rebut the presumption that her within-Guidelines sentence is substantively reasonable, there was no abuse of discretion.

Finally, as to Ms. Hopper's contention that her role in the crime was minimal, this argument plainly amounts to a request that this court to reweigh the § 3553(a) factors, which we will not do. It is patent that the district court considered the particular circumstances of the crime through the lens of the § 3553(a) factors in arriving at its sentence. The court noted: (1) Ms. Hopper's words to the effect of "got you"; (2) the nightgowns that were obtained from Wal-Mart; (3) how Ms. Hopper, given that the bus was closely adjacent to her trailer, "certainly would have the opportunity to see what was occurring, if not having full view of what was occurring in that bus"; and (4) Ms. Hopper was able to see the firearm in the van. R., Vol. 3 at 214–15. Ms. Hopper obviously disagrees with the sentence imposed, but it is within the advisory Guidelines range and reflects a thorough weighing of the § 3553(a) factors. Accordingly, we are satisfied that the district court imposed a substantively reasonable sentence and did not abuse its discretion.

## III

For the foregoing reasons, we conclude that the district court did not abuse its discretion in denying Ms. Hopper's motion to sever, her convictions are based on sufficient evidence, and her sentence was substantively reasonable.  We affirm.

Entered for the Court


Jerome A. Holmes
Circuit Judge