**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 19, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOSE MANUEL MADRID, JR. and
STEVE MADRID,

      Defendant - Appellants.

No. 05-2088
No. 05-2090
District of New Mexico
(D.C. No. CR-03-847-JC)

**ORDER AND JUDGMENT**[*]

Before **MURPHY, HOLLOWAY** and **HARTZ**, Circuit Judges.

**I**

The following Parts I thru III-C are entered for the court by Judge Holloway. Part III-D is being entered by Judge Hartz for the majority of this panel as the judgment of the court. Judge Holloway dissents from the majority's order and judgment on Mr. Jose Madrid's sentence, and that partial dissent by Judge Holloway follows.

Defendant-Appellant Steve Madrid and his brother, Defendant-Appellant Jose Manuel Madrid, Jr., were jointly indicted and convicted at trial of charges related to trafficking in methamphetamine in the District of New Mexico. Each now brings a direct

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P.32.1 and 10th Cir. R. 32.1.

appeal. We will address both appeals together.

Defendant-Appellant Steve Madrid was charged in a superseding indictment on six counts and convicted at jury trial on all six. Count I was a charge against Steve Madrid and Jose Madrid of conspiracy to possess with intent to distribute 500 grams or more of a mixture containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & 846, from on or about September 1, 2001, to on or about April 17, 2003. Counts II, IV, and V were discrete charges against Steve Madrid of distribution of methamphetamine. Count III charged Steve Madrid with brandishing a firearm during and in relation to a drug trafficking offense, and Count VI charged possession by him of a firearm in furtherance of a drug trafficking offense. Defendant-Appellant Jose Madrid was charged only in Count I and, as noted, was convicted on that charge.

Steve Madrid was sentenced to 235 months on the conspiracy and trafficking counts and, as required by statute, was given consecutive sentences on the firearms counts – 84 months on Count III and 300 months on Count VI – for a total sentence of 619 months of imprisonment. Steve Madrid was also sentenced to five years of supervised release and was ordered to pay a special assessment of one hundred dollars on each count for a total of six hundred dollars. Jose Madrid was sentenced to 292 months' imprisonment and five years' supervised release, and was ordered to pay a special assessment of one hundred dollars.

## II

The government called fourteen witnesses at trial. Of these, three were records

custodians for telephone companies, eight were law enforcement officers, and three were cooperating witnesses who implicated themselves in drug trafficking by their testimony. For purposes of this appeal, it will suffice to sketch the testimony of only a few of these witnesses, most prominently the cooperating witnesses.

Melissa McKelvey testified that in June 1999 both Defendants came to her house to collect a drug debt. Both carried pistols tucked into the backs of their trousers. In 2001, McKelvey began dealing with the Defendants again, selling two ounces of methamphetamine at least once a week for several months before she was arrested.

John Wesley Cook testified to drug transactions with Steve Madrid beginning in September 2001. Cook had been "fronted" a pound of methamphetamine from Steve Madrid (that is, given the drug first, with payment to follow later), and, Cook testified he had been unable to pay the $13,000 price for it because Eric Demoss, an employee of Cook's who had introduced him to Steve Madrid and who was to help him sell the methamphetamine, had absconded with most of the drug. About two weeks later, Steve Madrid started calling him, wanting payment for the drug. Cook testified that when he said that he could not pay and explained why, Steve Madrid made threatening statements. Cook said that he and his family were threatened, that Steve Madrid called him "a couple of times," and that another man whom he did not know also "was calling me."

About a week after the first of these phone calls, or about three weeks from the day that he had received the pound of methamphetamine, Steve Madrid, accompanied by three or four other men and one woman, confronted Cook to demand payment of the debt.

Cook said that he did not recall how he "met up" with the group. He said that he went with the group to Eric Demoss's girlfriend's house, and that in the backyard of that residence, Steve Madrid and his companions threatened Cook. Cook said that all of the members of the group except the lone woman were armed. The guns he saw were all pistols except for one that he said looked like a sawed-off shotgun.

Cook testified that he was arguing with Eric Demoss about the money, and said about Steve Madrid and his companions: "They're out with the guns, threatening, yelling, screaming at us." (I Tr. Trans. 14.) He said that the guns were pointed "around." Cook testified that he gave them $800, all of the money he had, and Madrid agreed to give him more time to pay the balance.

Cook did pay $4,000 to some of Steve Madrid's associates about a week later, money which he had borrowed, and explained that he believed that Demoss and his girlfriend should be responsible for the balance of the debt because they had taken the drugs. Cook believed at first that his partial payment and explanation had been accepted, but after some days had passed, Steve Madrid began calling him and demanding the rest of the money.

Cook testified that, at Steve Madrid's suggestion, he began selling methamphetamine for Madrid to pay off the balance of the debt and that he did this for six to eight months, from about October 2002 until his house was "raided" in May 2003.[1]

---

[1]Mr. Cook's testimony was inconsistent about the dates. In cross-examination, he was asked about his earlier interview with an agent in which he had said that he dealt about three ounces several times per week for the period of December 2001 to May 2002.

-4-

During that time, Cook sold three ounces of methamphetamine for Madrid about three times a week.

At some point, one of the associates of Steve Madrid with whom Cook had dealt told Cook that Steve and his brother Jose, who was often called "Joel," were "having problems," and that Cook needed to meet Joel because "Steve was no longer in the picture." A meeting was arranged and Jose Madrid told Cook that Cook should deal with him in the future instead of with Steve. Thus, Cook also got methamphetamine from Defendant Jose Madrid. The arrangements were the same, Cook said. He received the same amounts at the same frequency while dealing with Jose Madrid.

Another cooperating witness, Kim Gaivan, testified regarding her dealings with Steve Madrid. After she had agreed to cooperate with authorities, she had begun recording telephone conversations with her supplier, who was known as "Sugar." Several recorded calls were played for the jury. In one of these calls, Ms. Gaivan had called a number where she thought she might reach Sugar and instead had a conversation with Steve Madrid. Steve Madrid told her that he would have Sugar call her back. Ms. Gaivan said that she had never met Steve Madrid. Nevertheless, perhaps because he believed Ms. Gaivan to have known Sugar, Steve Madrid offered to supply methamphetamine to her during a subsequent telephone contact. Ms. Gaivan arranged to come "to Roswell" on April 2, 2003, to meet Steve Madrid and pick up the methamphetamine he had agreed to sell her.

Upon arriving in Roswell, Ms. Gaivan met with agents to set up the procedures for

what agents refer to as a "controlled buy." Officers accompanied her on her way to the place where the deal was to be done and remained at a distance until she came out again. The place was a mobile home that she referred to, without objection, as "Steven's." When asked the address of the place, she said only that it was on "Anasazi," without specifying a city. Upon entering a bedroom of the home where Steve Madrid and another man were, she saw a long gun, "like a rifle," on the floor. This scared her, and Steve Madrid reassured her: "I must have been staring at it. Steven said, 'Oh, it's just a BB gun.'" (I Tr. Tran. 121.) Ms. Gaivan said that she did not know enough about guns to know whether it was a rifle or, as defendant Steve Madrid had said, a BB gun.

Steve Madrid then gave her about 104 grams of methamphetamine, which he got from a cabinet or dresser in the room. He also gave Ms. Gaivan a card with three telephone numbers hand-written on it, to facilitate future contacts. He explained that one of the phone numbers was his brother's. Ms. Gaivan said that at that time she "was reaching him through his brother." Upon leaving the mobile home, Gaivan returned to Roswell and turned over the methamphetamine and the card to officers.

Two of the officers who were on the surveillance team that followed Ms. Gaivan to the site of the April 2, 2003, controlled buy also testified. Dean Cook, an agent with the Drug Enforcement Agency (DEA), testified that he was one of "close to a dozen agents and officers" who met Ms. Gaivan at Roswell prior to her going to the mobile home. Agent Cook testified that Ms. Gaivan, who was driving her own car, first went about three or four miles south of town to a convenience store where she made another

telephone call (which she later testified was to Steve Madrid) and was given directions to go to a house a little further south and then east on Anasazi Road. Agent Cook described the setting as rural and remote, so that the officers could not get too close. The officers did see Ms. Gaivan pull into the driveway.

Another DEA agent, Mike Murphy, also testified about the events of April 2, 2003, although that was only a small part of his testimony. He was asked by the prosecuting attorney, without objection, about the April 2 purchase where Ms. Gaivan "met with Steve at his house." He also said that the town of Dexter is about 15 miles south of Roswell, a fact that will enter into our discussion *infra*.

Two weeks after the first controlled buy, on April 15, 2003, Gaivan met Steve Madrid at a parking lot in Roswell and gave him $4,600 for the methamphetamine she had received on April 2 and got an additional amount of methamphetamine to sell.

On April 17, 2003, DEA agents served a search warrant at Jose Madrid's residence in Roswell and on a mobile home located at 29 Anasazi Road, Dexter, New Mexico. Agent Gerald Maestas of the DEA testified without objection that the Dexter residence was the home of Steve Madrid. Steve Madrid and two others were present, and Steve Madrid was arrested then, as the officers also had an arrest warrant for him. The officers found no drugs, but they did find $2,300 on Steve Madrid and drug paraphernalia and two firearms in the house. The two firearms were in different bedrooms of the abode. The rifle, along with considerable paraphernalia, was found in a bedroom that apparently was not being used as a bedroom at the time.

That room was in disarray with chairs and trash scattered about. A day planner or journal of some kind was also found in that room, with entries in it that an agent testified appeared to record drug transactions. Some of the paraphernalia was found in or on a dresser in that room. A pistol was found in the other bedroom. The officers also found a photograph of Steve Madrid and three others, and an outdated (1995) voter identification card that had been issued to Steve Madrid, which showed a different address in Dexter. There was also a business card from a gun store on which had been handwritten a receipt for the purchase of a pistol sold in 2001 to Steve Madrid.

### III

On appeal, each Defendant challenges his sentence, and Steve Madrid challenges his convictions on the two weapons counts under 18 U.S.C. § 924(c).

### A

Steve Madrid contends that the evidence was insufficient to support the jury's verdict of guilty on Count VI, possession of a firearm during and in relation to a drug trafficking offense. We review the sufficiency of the evidence de novo, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the verdict. *See United States v. Dashney*, 117 F.3d 1197, 1202 (10th Cir. 1997).

The verdict form used in this case required the jurors, if returning a guilty verdict on Count VI, to specify which of the two weapons seized in the execution of the April 17 search warrant was possessed in connection with the conspiracy charged in Count I (or the jurors could have found that both were so possessed). The jurors found Defendant

Steve Madrid guilty as to the rifle that had been found in the closet of one of the bedrooms of the mobile home and not guilty as to the pistol that had been found in the other bedroom. Steve Madrid now asserts that the evidence was insufficient in two ways: insufficient to show that it was he who possessed the rifle and insufficient to show that possession was in connection with a drug offense. *See United States v. Avery*, 295 F.3d 1158, 1172 (10th Cir. 2002) ("Obtaining a conviction under the 'possession' prong of § 924(c)(1) requires the government to prove (1) that the defendant possessed a firearm and (2) that the possession was 'in furtherance of' a drug trafficking offense . . . .").

First, we reject the contention that the government failed to prove that the mobile home on Anasazi Road, where the rifle was found in execution of the search warrant and the arrest warrant, was the residence of Defendant Steve Madrid. Counsel has failed in the obligation to tell us where in the record we may find that the issue was raised in the district court. 10th Cir. R. 28.1(C)(2). In fact, it seems fairly clear that the issue was *not* raised below.[2] References in testimony to the location as the residence of Steve Madrid were made without objection. Even more telling, counsel for Mr. Madrid also referred to the location as "Steve Madrid's residence" in cross-examining Agent Maestas about the execution of the search warrant. (I Tr. Tran. 282.) Among the items seized in executing

[2]On our own motion, we ordered the record supplemented with the full trial transcript, which Appellant's counsel failed to provide. That transcript does not, however, include closing arguments of counsel. We decline to investigate further in the likely vain hope of turning up something to show that the issue was raised below. We note that when counsel moved for a judgment of acquittal on Count VI, he did not suggest that the government had failed to prove that the mobile home was Defendant Steve Madrid's residence.

the search warrant were an out-of-date voter registration card in Steve Madrid's name (which showed a different address) and a receipt made to Steve Madrid for a firearms purchase in 2001.

The evidence presented to prove that the place searched on April 17 was the residence of Steve Madrid was not overwhelming. But because the issue was not raised at trial and because we must view the evidence in the light most favorable to the jury verdict, we conclude that the evidence was sufficient to show that the place was Steve Madrid's residence – or at least a place over which he could exercise some control.

Defendant Steve Madrid's argument that the evidence was insufficient to show possession of the rifle is not entirely dependent, however, on this point. He also asserts, albeit rather circuitously, that the elements of constructive possession were not sufficiently established. The factual predicate for this contention is that the home was occupied by three persons at the time the weapon was found, and the room in which it was found did not appear to have been used as a bedroom. Thus, Defendant Steve Madrid argues, the mere presence of the rifle in the closet in that bedroom is insufficient, standing alone, to prove that he constructively possessed the rifle.

The government's evidence consisted of more than the mere presence of the rifle in a closet in Steve Madrid's residence, however, and we conclude that the evidence was sufficient. And the same evidence also answers Steve Madrid's final point in this challenge, in which he argues that there was not a sufficient showing that the weapon was possessed "in furtherance of" the drug trafficking conspiracy as alleged in the indictment.

-10-

Therefore, we will discuss these two contentions together.

The principles of constructive possession are well established:

> Constructive possession, we have explained, exists when a person "knowingly has ownership, dominion, or control over" the particular object. In "most cases," constructive possession over an object "may be inferred if a defendant had exclusive possession of the premises" where the object is found, but constructive possession may also be found in joint occupancy cases where the government demonstrates "some connection or nexus between the defendant and the firearm or other contraband."

*Avery*, 295 F.3d at 1177 (internal citations omitted). Evidence that possession of the firearm was in furtherance of a drug trafficking crime is sufficient if it shows "that the defendant's firearm possession 'furthered, promoted or advanced his illegal drug activity.'" *Id*. at 1180 (quoting *United States v. Iiland*, 254 F.3d 1264, 1274 (10th Cir. 2001)). Further,

> a firearm that is kept available for use if needed during a drug transaction is possessed "in furtherance of" drug trafficking . . . as long as such possession "in furtherance of" is the intent of the drug trafficker. Such intent would necessarily be subject to proof by circumstantial evidence, and factors such as the type of drug activity being conducted, the accessibility of the firearm, the type of firearm, the legal status of the firearm, whether the firearm is loaded, the proximity of the firearm to drugs or drug profits, and the time and circumstances under which the firearm is found would be relevant and helpful to a jury in determining the intent with which the weapon was possessed. The mere possession of a firearm in proximity to drugs or drug proceeds would not require a finding that a weapon was possessed in furtherance of drug trafficking, but could be considered by the jury along with other evidence in arriving at a decision as to intent.

*United States v. Basham*, 268 F.3d 1199, 1208 (10th Cir. 2001).

In opposing Defendant Steve Madrid's motion for judgment of acquittal at trial, the government argued, as it does on appeal, that the "in furtherance" requirement was

met by evidence that the cooperating witness, Ms. Gaivan, saw a long barreled gun on the floor of the bedroom where she made a controlled buy from Steve Madrid on April 2, just 15 days before the rifle was found in execution of the search warrant. But Mr. Madrid contends that the prosecution failed to prove that the mobile home at which Ms. Gaivan saw a gun was the same mobile home at which the search warrant was executed, pointing to the fact that she described the place where she met Steve Madrid as near Roswell, while the government's witnesses testified that the search warrant was executed at an address in Dexter.

As noted supra, Agent Cook testified that on April 2, 2003, he was among the officers who followed Kim Gaivan as she went to meet Steve Madrid. Agent Cook said that Ms. Gaivan first drove three or four miles south of Roswell and then stopped to make a telephone call. After that call, she proceeded "a little ways south of there and then back east on – I think Anasazi was the name of the road." (I Tr. Trans. 95.) Thus, the evidence roughly established that the location of the mobile home at which Ms. Gaivan got methamphetamine from Steve Madrid was more than three miles south of Roswell. Taking the evidence in the light most favorable to the jury verdict, as we must, the location may well have been five or more miles south of Roswell. There was testimony that Dexter is about 15 miles south of Roswell. This evidence does not preclude the possibility that the mobile home on Anasazi Road may have had a Dexter address, even if it was closer to Roswell than to Dexter.

The evidence on this point was certainly not overwhelming, and in light of the fact

-12-

that the conviction on Count VI added 25 years to an already very substantial term of imprisonment, the relative thinness of the evidence does not speak well for the government's presentation of its evidence. But we are convinced that the problem is in the presentation, rather than the substance, of the evidence. The prosecution certainly should have elicited more testimony to eliminate the confusion caused by the fact that the residence had been described as either outside Roswell or as having a Dexter address. But as with the question whether it was the residence of Steve Madrid, we believe that the fact that the point was not raised below by counsel for the Defendant likely is a primary reason for the relatively slim evidence on this point. In any event, the strongest evidence is that Ms. Gaivan, in her testimony, identified Government Exhibit 31 as a photograph of a dresser in the bedroom in which she met Steve Madrid on April 2 and from which he obtained the methamphetamine he gave her. That exhibit was later identified by Agent Maestas as being a photograph of the dresser in the unoccupied bedroom of the mobile home searched on April 17, which was next to the closet in which the rifle was found.

We conclude, then, that the evidence was sufficient to show that the transaction described by Ms. Gaivan took place in the same room of Mr. Steve Madrid's residence where the rifle was found by the officers executing the search warrant fifteen days later. The final question, then, is whether this evidence provided a legally sufficient basis for the jury to find that the rifle was possessed in furtherance of the drug conspiracy. We think that the evidence was sufficient for the jurors to find that the rifle found in the closet on April 17 was the same rifle that had been on the floor of the same room during the

controlled buy on April 2. That inference certainly did not have to be drawn by the jury, but we conclude that it was a reasonable inference which the jury could have, and apparently did, draw.[3]

Thus, we have not only a rifle that was in very close proximity to drug paraphernalia when found, but also one that apparently had been in plain view during one specific drug transaction and which had startled the cooperating witness who participated in that transaction. And the jurors had heard expert testimony from officers about the prevalence of weapons in their experience in drug investigations and the perceived advantages to dealers in illicit drugs of weapons to protect their activities. We conclude that the evidence was sufficient to support the guilty verdict against Steve Madrid on Count VI, possession of a firearm in furtherance of a drug trafficking offense.

**B**

Mr. Steve Madrid also challenges the sufficiency of the evidence on Count III, which charged him with brandishing a firearm during and in relation to a drug trafficking offense. Mr. Madrid's contention on this issue is that the testimony of John Cook was insufficiently specific to show that the alleged act had occurred at the time and place alleged in the indictment. The indictment alleged that the incident occurred in Eddy

---

[3]The previously mentioned fact that the jurors found defendant not guilty of possessing, in furtherance of the drug trafficking conspiracy, the pistol found in the other bedroom, very strongly suggests that the jurors' decision to convict as to the rifle was based on the fact that Ms. Gaivan's transaction had occurred in the room where the rifle was found fifteen days later. This in turn strongly suggests that they found that it was, in fact, the same weapon, in spite of Ms. Gaivan's inability to say whether the long-barreled object she saw was a rifle or merely a BB gun.

-14-

County, New Mexico, on or about October 2001.

Mr. Cook testified that he met Steve Madrid in September 2001, and that the incident in which the gun was brandished occurred about three weeks later. This is sufficient to establish that the incident occurred "reasonably near" the date alleged in the indictment, which is legally sufficient to support the conviction. *See United States v. Castillo*, 140 F.3d 874, 885 (10th Cir. 1998).

Steve Madrid also asserts, however, that the evidence showed only that the incident occurred in the backyard of Eric Demoss's girlfriend's house and is "utterly silent" about where this house may have been. On this, Defendant is correct. Once again, however, there is no indication that this issue was raised in the district court. The government's brief does not respond to this point.

Under section 924(c), all sentences are to run consecutively to any other sentence, and Steve Madrid was sentenced to another seven years because he was convicted on Count III. But that was not the greater part of the effect the conviction on this count had on the overall sentence. Because he was convicted on Count III, Mr. Madrid's sentence on Count VI became a subsequent conviction, and under subsection 924(c)(1)(C) his sentence on Count VI was therefore a mandatory minimum of 25 years, instead of a mandatory minimum of five years, to be served consecutively to any other sentence. Thus, the conviction on Count III indirectly accounts for 324 months, or 27 years, of the 619-month sentence meted out to Mr. Madrid.

Both sides must have realized as they prepared for trial that this would be the

-15-

inexorable consequence of conviction on both of these section 924(c) counts, and on appeal it is one of the basic facts of the case. Given the consequences of the conviction on Count III, the performance of counsel on both sides is quite lamentable. At trial, the government utterly failed to introduce evidence of the place at which the act occurred, and counsel for Steve Madrid failed to raise this deficiency. On appeal, neither side cites the plain error standard, nor any authority to guide our analysis of the issue. Again, the government does not address this deficiency in the evidence.

We review the issue for plain error only. The standards for plain error review are familiar.

> [T]he error must (1) be an actual error that was forfeited; (2) be plain or obvious; and (3) affect substantial rights, in other words, in most cases the error must be prejudicial, i.e., it must have affected the outcome of the trial. . . . . Given plain error that affects substantial rights, an appellate court should exercise its discretion and notice such error where it either (a) results in the conviction of one actually innocent, or (b) "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*United States v. Keeling*, 235 F.3d 533, 538 (10th Cir. 2000) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)) (internal citations omitted).

At first blush it might seem that the failure to provide any evidence of the location of the place where the gun was brandished, other than that it occurred in someone's backyard, would be error that is plain. Venue is an element of the offense that must be proved. *United States v. Cryar*, 232 F.3d 1318, 1323 (10th Cir. 2000). Proof that an offense occurred at someone's residence, without proof of the location of that residence, is insufficient to establish venue where the nature of the crime and the evidence shows

-16-

that the crime occurred at some single, distinct location. *See United States v. Evans*, 318 F.3d 1011, 1021-23 (10th Cir. 2003) (venue not proved for charge of attempted manufacture of methamphetamine and possession of ephedrine and pseudoephedrine with the intent to manufacture methamphetamine). So, if the charge here were, for example, simple assault based on the brandishing of the weapon, the failure to prove that act occurred within Eddy County, New Mexico, as charged in the indictment, might well be plain error. But the nature of the crime alleged here is not so straightforward as simple assault, and this is important for our analysis.

The location of a charged offense "must be determined by the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998). Not all crimes occur in a single location. Congress has provided that: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and competed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).

Therefore, we must look to the nature of the crime alleged. Count III charged that "[i]n or about October 2001, in Eddy County," Defendant Steve Madrid brandished a firearm "during and in relation to a drug trafficking offense" and specifically the offense of distribution of a mixture and substance containing methamphetamine as charged in Count II of the indictment. Count II charged that Defendant Steve Madrid "distributed 50 grams and more of a mixture and substance" containing methamphetamine "[i]n or about

-17-

September 2001, in Eddy County, in the State and District of New Mexico . . . ."

In spite of the limitations created by a record that does not include the opening and closing statements by counsel and briefs that offer no guidance at all in our analysis of this issue, we still can determine with confidence from the evidence and from the alleged connections between Count II and Count III that Count II is based on the sale of methamphetamine to cooperating witness John Cook. Cook testified that his first purchase of methamphetamine from Steve Madrid occurred in September 2001. We can further determine with confidence that it was his testimony which established the brandishing incident on which Count III clearly must have been based, as he was the only witness to testify to seeing Defendant brandish a gun, as opposed to merely carrying one. Mr. Cook testified that the brandishing incident occurred about three weeks after he had received the methamphetamine from Defendant Steve Madrid and that Steve Madrid was demanding payment for that first delivery when the incident occurred. This is reflected in the indictment's placement of Count II in September 2001 and Count III in October 2001.

For the crime alleged in Count III to have occurred both "during" and "in relation to" the distribution of methamphetamine alleged in Count II, it must have been the government's theory that the  transaction can be viewed as having been on-going three weeks after the delivery of the drug, when Defendant Steve Madrid attempted to collect payment from witness Cook. This in the only cogent theory that we can infer from the allegations and the evidence.

It is in this context that we must approach the first step in the plain error analysis,

determining whether there was error. Again, if the allegations and the evidence had been of a single event, such as a simple assault with the gun, then clearly there would have been error. On the other hand, if the brandishing of the weapon had been alleged to have occurred in connection with a kidnaping that involved acts taken both in New Mexico and outside that state, then under *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999), there might be no error assuming that some of the acts were proven to have occurred in New Mexico. Certainly in this case it was proven that most of Steve Madrid's acts were done in New Mexico.

Whether there was a failure to prove venue in this case then must be seen as turning on whether the drug transaction alleged in Count II *must* be viewed as a "point-in-time offense," to use a phrase from *Rodriguez-Moreno*. In that case, the Court rejected the contention that the section 924(c) offense of using and carrying a firearm during and in relation to a kidnaping was a "point-in-time" offense. Even though the evidence in that case had shown use of a firearm only in Maryland, the Court held that venue was proper in New Jersey, and would have been proper in any state in which the kidnap victim had been held by his captors. If it is permissible for a drug transaction to be viewed as on-going from the time of delivery of the drug until at least the effort to collect the payment for the drug three weeks later, like the kidnaping in *Rodriguez-Moreno*, then the evidence at trial which showed that the delivery of methamphetamine charged in Count II took place in New Mexico, apparently would be sufficient to establish venue for Count III in New Mexico, no matter where that collection attempt involving brandishing the weapon

had occurred. Our research has not led us to a case that directly addresses this issue.

We need not decide that issue, however. It is sufficient to conclude, as we do, that *if* there was error in failing to prove that the brandishing occurred in New Mexico, it was not plain error, based on the allegations and the evidence in this specific case. We have gone to great lengths to develop this argument, which is only suggested by Defendant's brief with its focus solely on the lack of evidence to show where the gun was brandished and its failure to analyze the consequences of that fact within the proper plain error framework.

We will, however, note two other considerations that also weigh in favor of our decision that there is no plain error here. First, "this court and others have consistently treated venue differently from other, 'substantive' elements of a charged offense." *United States v. Miller*, 111 F.3d 747, 749 (10th Cir.1997). "We have also applied a more relaxed standard for finding waiver of venue rights than for finding waivers of other constitutional rights in criminal trials." *Id.* at 750.

Second, this error, if there was error, is one that might have been cured at trial had defense counsel raised the point. The trial judge would have had the discretion to allow the government to re-open its case for the purpose of asking the witness whether he knew if the incident occurred in Eddy County, as alleged in the indictment. *See United States v. Bolt*, 776 F.2d 1463, 1471-72 (10th Cir. 1985); *United States v. Hinderman*, 625 F.2d 994, 996 (10th Cir. 1980). Because the error, if any, could have been corrected at trial, in the district court's discretion, it is quite unlikely that we could have found it to be a defect

which "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. To rule otherwise could create a perverse incentive for counsel to refrain from raising the defect at trial in hopes of an acquittal on appeal, knowing that if the issue were raised at the close of the prosecution's evidence, the trial judge might allow the government to reopen its case.

C

Before we analyze the sentencing issues presented in these appeals, we will outline the essential background in which the district judge made his sentencing decisions. As noted, the superseding indictment charged that both defendants conspired to possess with intent to distribute 500 grams or more of a mixture containing methamphetamine. Conviction on this count provided a baseline drug quantity for determining the offense level under the Sentencing Guidelines, but the Presentence Report (PSR) in each case reviewed the trial evidence and recommended a finding of a significantly larger quantity of methamphetamine.

The PSR in each case noted that the methamphetamine that Ms. Gaivan had obtained from Steve Madrid had been turned over to officers immediately after the transactions and had subsequently been weighed and tested for purity. The PSR recited the trial testimony of these findings. The drug provided first to Ms. Gaivan was determined to be 65% pure and to weigh 105.7 grams, yielding 68.71 grams of "pure

(actual) methamphetamine."[4]  The drug provided to Ms. Gaivan the second time was determined to be 66% pure and to weigh 218.8 grams, yielding 144.4 net grams of actual methamphetamine.

In addition, the PSR in each case included estimates of the amounts of methamphetamine that had been delivered to co-operating witnesses John Cook and Melissa McKelvey, again as based on the trial testimony.  The Probation Office estimated in the PSR that Mr. Cook was obtaining three ounces of methamphetamine three or four times per week for approximately six months.  The PSR estimate was then based on three deliveries per week over 26 weeks, for 6,552 grams of methamphetamine.  To this estimate, the PSR added one pound based on the initial delivery to Mr. Cook, thus arriving at a total of 7006 grams or 7 kilograms.

As to the methamphetamine provided to Ms. McKelvey, the PSR noted that she had testified that she could not recall how much of the drug she had obtained on each occasion and proceeded to estimate the total quantity "by calculating the bottom range of what she estimated."  The PSR thus estimated that she had obtained one ounce per week over a period of five months in 1999 (which the writer of the PSR called a "very low estimate"), for a total of 560 grams of a mixture containing methamphetamine.  Similarly,

_____

[4]Both the statute, 21 U.S.C. § 841(b)(1)(A)(viii), and the applicable guideline, USSG § 2D1.1(c)(2), separately address pure or actual methamphetamine and mixtures containing methamphetamine.  In order to provide standards for cases involving different drugs or, as here, some quantities of pure methamphetamine and some quantities of a mixture containing methamphetamine but of unknown purity, the Guidelines direct the district courts to convert drug quantities to an equivalent quantity of marijuana.

the PSR estimated that Ms. McKelvey obtained one ounce per week over a five month period in 2001, or 560 grams in that period, for a total of 1120 grams.

Taking all of the drug quantity evidence together, the PSR in each case arrived at an estimate (as corrected by the prosecutor at the sentencing hearing) of 213.4 grams of "pure (actual) methamphetamine" and an additional 8.12 kilograms of a mixture and substance containing methamphetamine. After converting these quantities to their "marijuana equivalent," *see* n.4, *supra*, the PSR in each case arrived at a base offense level of 36.

The offense level for each defendant was increased on the basis of his role in the offense, and Jose Madrid's offense level was also increased for his having possessed a firearm in connection with the conspiracy. (Steve Madrid's offense level was not increased similarly because he had been separately charged and convicted on two counts related to firearms, which increased his ultimate sentence much more dramatically than his brother's was increased by the offense level enhancement.) The resulting guidelines range for Jose Madrid was 292 to 365 months. The resulting guidelines range for Steve Madrid was 235 to 293 months, with the additional 84 months from Count III and 300 months from Count VI to be served consecutively to any guidelines sentence, as required by statute. As noted, the judge sentenced Jose Madrid to 292 months and Steve Madrid to 619 months (235 plus 384), using the low point of the guidelines range for both.

Each defendant contends that the trial judge erred in determining his sentence by applying the sentencing guidelines mandatorily in contravention of *United States v.*

*Booker*, 543 U.S. 220 (2005). The district court sentenced both Defendants at the conclusion of a sentencing hearing conducted on March 21, 2005, just two months after the landmark *Booker* ruling. Although the transcript shows that the trial judge did not expressly acknowledge that the guidelines were no longer to be applied mandatorily after *Booker*, the arguments by counsel directly addressed the point. For example, the prosecutor referred to the remedial holding of *Booker*, saying, "they fixed it by making them not mandatory." App. (Jose Madrid) at 65. This came after both defense attorneys had invoked *Booker* in their arguments. *Id.* at 57-63. These were not the only references to the *Booker* ruling in the fairly short proceeding.

It is simply inconceivable that the judge would have been unaware of the much anticipated ruling by the Court on the guidelines, especially when he had just heard counsel's arguments. Thus, we reject the contention that the trial judge made an error of law by treating the guidelines as mandatory.

Each Defendant also contends that the district judge violated his Sixth Amendment right to trial by jury by increasing his sentence on the basis of facts set out in the Presentence Report, which the district judge found under the preponderance of the evidence standard. We have repeatedly upheld this practice, holding that "so long as the district court applies the Guidelines in an advisory, rather than a mandatory, fashion, it may rely on facts found by a judge to be true based on a preponderance of the evidence." *United States v. Bustamante*, 454 F.3d 1200, 1202 (10th Cir. 2006).

We note that Jose Madrid does not challenge the sufficiency of the evidence to

support, by the preponderance of the evidence standard, the findings of the PSR that were adopted by the court. Steve Madrid makes some criticism of the evidence and, in particular, of the estimates of drug quantity produced by the probation officer who prepared the Presentence Report. The drug quantity calculations were based on the testimony of the three cooperating witnesses. The testimony of Kim Gaivan referred only to her two controlled buys, and the methamphetamine she purchased was turned over to officers, weighed, and tested for purity. No exception to that evidence is argued on appeal.

It is the estimates based on the testimony of John Cook and Melissa McKelvey that Steve Madrid contests. For example, he argues that a chemist must qualify as an expert before being allowed to testify that he or she identified a substance as methamphetamine, but that these lay witnesses were permitted to simply declare that the substances they regularly acquired from the Defendants were methamphetamine. However, our cases have not required scientific evidence to prove that a substance is a controlled substance as charged, even when applying the beyond a reasonable doubt standard. *See United States v. Sanchez DeFundora*, 893 F.2d 1173, 1175-76 (10th Cir. 1990). Considering that these witnesses were using the drug as well as selling it, their testimony was sufficiently reliable to meet the preponderance of the evidence standard. *Id. See also United States v. Cantley*, 130 F.3d 1371, 1379 (10th Cir. 1997).[5]

---

[5]A thorough discussion of the issue is found in the opinions in an unpublished case, *United States v. Jackson*, 1998 WL 642410, 161 F.3d 18 (table) (10th Cir. 1998).

Steve Madrid's challenge to the estimations of drug quantity based on the testimony of cooperating witnesses Cook and McKelvey is too vague and cursory to merit discussion. The judge adopted the findings of the Presentence Report, which were based on the trial testimony as summarized, *supra*. We have consistently held that it is permissible for the sentencing judge to make estimates as long as the information relied upon has support in the evidence and "bears sufficient indicia of reliability." *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005). Because Mr. Madrid does not allege any specific error in this process, we need not consider this point further.

Steve Madrid also challenges the ruling that his conviction on Count VI (which involved the rifle found at his home on April 17, 2003) was a second or subsequent conviction for violation of 18 U.S.C. § 924, a ruling which was based on his conviction on Count III (for brandishing a gun in his encounter with John Cook in October 2001). Madrid contends that his rights were violated because the indictment did not specifically charge a violation of 18 U.S.C. § 924(c)(1)(C)(I) and the jury did not separately find that he had a previous conviction. This argument is unpersuasive. The fact of a prior conviction is the one exception to the Fifth and Sixth Amendment holdings of *Booker* and its predecessors. In *Almendarez-Torres v. United States*, 523 U.S. 224, 247 (1998), the Supreme Court held that the existence of a prior conviction is merely a sentencing factor, and not a separate element of the offense that must be pleaded in an indictment. In *United States v. Moore*, 401 F.3d 1220, 1224 (10th Cir. 2005), we held that

*Almendarez-Torres* remains good law after *Booker.*[6]

This argument would thus have had no merit if the prior conviction had come from a different court and jury. This argument is even weaker in this case, where the same jury found the fact on which the sentencing enhancement was based. The jury had, obviously, convicted him on Count III; there was no further finding for the jury to make.[7]

**HARTZ**, J., writing Part III-D, joined by **MURPHY**, J.:

**D**

We fully join Parts I through III-C of Judge Holloway's opinion, which disposes of all issues in Steve Madrid's appeal, No. 05-2090, and all but one issue in Jose Madrid Jr.'s appeal, No. 05-2088.

The remaining issue is Jose Madrid's challenge to the reasonableness of his sentence. We have recognized two components to the reasonableness of a sentence: (1) the procedure employed in imposing sentence and (2) the length of the sentence. *See United States v. Kristl*, 437 F.3d 1054, 1055 (10th Cir. 2006). The defendant need not

---

[6]We note, however Justice Thomas's concurring opinion in *Shepard v. United States*, 544 U.S. 13, 27 (2005) (Thomas, J., concurring) (stating *Almendarez-Torres* "has been eroded by the Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that *Almendarez-Torres* was wrongly decided").

[7]Nor is there any error in the fact that the "prior" conviction came in the same proceeding as the "subsequent" conviction. *Deal v. United States*, 508 U.S. 129 (1993).

object in district court to the reasonableness of the length of a sentence. *See United States v. Lopez-Flores*, 444 F.3d 1218, 1221 (2006). But failure to object to the court's *procedures* forfeits the objection so that appellate review of those procedures is limited to plain error. *See id.*

Mr. Madrid's challenge on appeal encompasses both the district court's procedures and the length of his sentence. His procedural claim is that the court failed to consider several mitigating circumstances that demanded a shorter sentence. At sentencing, however, Mr. Madrid did not protest that the court had not explicitly addressed those circumstances when it handed down its sentence. Thus, we review for plain error.

Our recent decision in *United States v. Ruiz-Terrazas*, No. 06-2138 (Feb. 26, 2007) held that when, as here, the district court imposes a sentence within the guidelines range, the court must provide "only 'a general statement noting the appropriate guideline range, and how it was calculated.'" *Id*. at 11 (quoting *Lopez-Flores*, 444 F.3d at 1222 (further internal quotation marks omitted)). Mr. Madrid suggests no failure in this regard. When this requirement is satisfied, "we will step in and find error [only] when the record gives us reason to think that our ordinary . . . presumption that the district court knew and applied the law is misplaced." *Id*. at 12–13. That presumption is a strong one, particularly when reviewing an experienced judge on a matter that frequently comes before him. We are disinclined to reject the presumption on plain-error review, when a simple objection in district court could have resolved any ambiguity. Accordingly, we deny Mr. Madrid's challenge to the sentencing procedure.

As for the reasonableness of the sentence, we recognize that it is quite harsh.  But harsh sentencing for drug offenses is clearly federal policy.  In that light we hold that Mr. Madrid's sentence was not unreasonable.


Entered for the Court


Per Curiam

Nos. 05-2088 and No. 05-2090, *United States v. Madrid, et al.*

**HOLLOWAY**, Circuit Judge, dissenting in part:

Jose Madrid contends that his sentence is unreasonable. We have held, however, that a guidelines-based sentence is presumptively reasonable. *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006). We have also held that the sentencing judge is not required to discuss, specifically and on the record, each of the statutory factors found in 18 U.S.C. § 3553(a). Nevertheless, in *United States v. Sanchez-Juarez*, we held that

> where a defendant has raised a nonfrivolous argument that the § 3553(a) factors warrant a below-Guidelines sentence and has expressly requested such a sentence, *we must be able to discern from the record that "the sentencing judge [did] not rest on the guidelines alone, but . . . consider[ed] whether the guidelines sentence actually conforms, in the circumstances, to the statutory factors."*

446 F.3d 1109, 1117 (10th Cir. 2006) (quoting *United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005)) (emphasis added; alterations in original).[1]

I am convinced that a nonfrivolous argument was made below that the sentence was unreasonable in Jose Madrid's circumstances. Appellant's App. at 62-63. These circumstances are undisputed: Jose has worked since he was eleven years old and before this offense had operated a family business, the J and J Pressure Wash. PSR at 14. He was a high school graduate in 1996 and co-owner of the family business in Dexter, New Mexico since 1993. *Id.* at 15. His previous employer, Southwest Concrete, had said that

---

[1] *Cf. United States v. Lopez-Flores*, 444 F.3d 1218, 1222 (10th Cir. 2006) (holding that where "defendant has not raised any substantial contentions concerning non-Guidelines § 3553(a) factors and the district court imposes a sentence within the Guidelines range, our post-*Booker* precedents do not require the court to explain on the record how the § 3553(a) factors justify the sentence").

Jose "was a good worker and he would be eligible for re-employment with this company." *Id.* at 16.  Jose had also worked for Leprino Foods in Roswell from 1998 through 2000. *Id.*

Jose was 27 years old at the time of the PSR and was married with three children: Sandra, six years old; Kassandra, three years old; and Manuel, one year old, who has a breathing disorder requiring frequent hospitalization.  Jose had ***no*** criminal history points. He had only minor traffic violations and the instant first-time drug offense.  *Id.* at 63.

While the offense of conviction is serious, as in *Sanchez-Juarez*, I find nothing in the record from which we can discern whether the sentencing judge relied on the guidelines alone, or whether he made the mandatory determination that the sentence based on the guidelines conformed, under the particular circumstances of this individual defendant, to the statutory factors.  I note that the statutory minimum sentence for this offense is ten years.  21 U.S.C. § 841(b)(1)(A).  Accordingly, I am convinced that we should remand to the district court with instructions to vacate the sentence of Jose Madrid so that he can be re-sentenced.